Thank you. Good morning, Your Honors. Michael Drake, Federal Defender's Office, on behalf of Mr. Punzalan. I just want to make two quick points about Mr. Punzalan's sufficiency claim. First, Ms. San Nicolas mistakenly states in her answering brief at page 7 that the discussion Mr. Punzalan had with the criminal informant took place in January of 2007. That's the wrong year. The year of impact was 2006. So, in other words, this discussion took place about a year before the firearm issue in this case was taken from Dennis Larson's home and a full 16 months before it was ultimately recovered from the IGA residence. I don't think the jury was even permitted to consider that discussion with respect to this count. It was an unrelated charge. It was introduced in connection with unrelated charges. But in any case, it's part of a charge. In connection with what? It was introduced in connection with counts 1 and 2, which were both possession counts on which he was acquitted. And that concerned controlled purchase back in January 2006. The second point I'd like to make is that it concerns the locked bedroom door. I think this is a critical issue here. The fact that someone locks a door doesn't really say anything about their exercise of dominion and control over the room unless at the very least the person can be shown to be aware that there's contraband in the room or can be shown to be tied to the property in some ways more than a casual guest. I think that's reflected in the cases that we've discussed in our papers. But I think it's also just common sense. If Judge McEwen is invited to a friend's house and she locks the guest room door for the evening to retire for the night, I don't think it would occur to anyone to say, well, by locking the door she has taken possession of everything that happens to be there. Not even for that temporary period of time? No, I don't think so, Your Honor. I think that the issue is knowing possession, right, the knowing possession, the knowing possession or conscious possession of an item that you know the nature of. Right. And if she goes into an unknown residence and decides to crash in a room and she locks the door, she has control over the items in the room to be sure. But it's not a conscious, kind of conscious. What about the proximity because locking the room might not be enough, and in general proximity is not enough all by itself. We know that. So where was the bag in relation to your client? It was within arm's reach was the testimony of the officers. So I think the issue is it's a bag within reach. I mean, if you walked into the room and there's a bag on the floor, do you have a duty to look inside someone else's? I mean, we can't assume it's his bag. Do you have a duty to look inside of the bag to see whether it was his? Well, the question is whether it supports an inference that it was his. Yes. I think the answer is no because, I mean, it's pointless. Because if I went into somebody's room, the guest room that you posited for me to visit, and I lock the door and it turns out that there's drugs in the little nightstand, you know, right there. It's right next to me. So I say, oh, my God, I had no idea. Of course, I locked the door because I wanted to lie down and rest. Do you think you don't think the jury would at least be able to make a determination based on inference as to what all that meant? Well, it depends. I mean, the burden of proving possession lies with the government, of course. So there I think you're talking about a situation where you would be obliged to testify as to your state of mind, right? You're saying that, well, I had no idea. It was, you know, I came in to crash the matter. So I think if the jury didn't have your testimony, right, it would have no basis upon which to draw an inference that you were in possession of the drugs in the nightstand. But we're on sufficiency of evidence. Right. Thank you. So all inferences, reasonable inferences, was drawn in favor of the verdict. Right. How does that change your argument? Well, I think the key word is inference, Your Honor, not guess, right? There's reasonable speculation. You can have reasoned speculation that's consistent with the evidence, but there has to be evidence that supports a reasonable inference beyond a reasonable doubt that, right, he possessed. He had conscious possession of what he knew to be a firearm in this case. And wasn't that what Nevels was all about? Yes, Your Honor. Nevels is the case where the police go into a bedroom and the guy is asleep or pretending to be asleep and he's got a Glock sitting on his chest. Right. And the three-judge panel said that wasn't enough. The in-bank court took that case and reversed it. Right. Well, there's several other factors in Nevels, right? So there was the actual physical contact with weapons that are in plain view. The weapons were loaded. He was tied to the apartment. There was testimony that he had been there two weeks prior. And so, right, all of those factors together. And there's also contraband in plain view. So plain view, contact, prior ties to the apartment. Well, here I guess the officer said it was right beside him near his waist. Yes. And it seems to be, at least from what I can read from the testimony, a room that's not a highly populated room in terms of objects, basically. The bed, the guy, the pillow, the gun. Does that matter? Actually, there was no bed, Your Honor. There's no bed. He's on the floor. There's a dresser, that's right. There's a dresser. There's a dresser, not a bed. Right. So he's on the floor with this bag within arm's reach right at his waist. Yes. And is there a case that you think is closest to your case? I don't think any of the cases are particularly close. I think you have to look at all of the factual elements that are brought to bear in the cases. You have plain view, physical contact, prior ties to the residence. Whether the weapon's loaded is material, because it's unlikely that someone's going to leave a loaded weapon out on the floor, whereas if it's unloaded, it's a fair guess that someone might just leave it in the room unloaded. You have – yeah. So, I mean, I think those kinds of – there are others I could enumerate, but I think you get the picture. If you look at – so I think – I mean, if you look at Ramirez, for instance, where he had contraband in his pocket, cocaine in his pocket, the contraband was in plain view. He had ties to the residence. There was a letter found in the dresser in the bedroom addressed to him at that residence. So are you arguing that this defendant had no ties to that residence? I'm arguing that there was no evidence presented to the jury that he had any ties to that residence. And the government didn't put out any of the sort of basic evidence that you see in some of the other cases? That's right, Your Honor. If the court has no further questions, I'd reserve the balance. Thank you. Thank you. May it please the Court, Rosetta Larson-Nicholas for the government, the appellee, Haffaday from Guam. Your Honor, I'd just like to focus on the sufficiency of the evidence. Now, the – as Mr. Drake has said, the conversation with Mr. Ichihara, the confidential informant, did occur on January 4th, 2006. And that was where the initial discussions were made that the defendant stated on the record, and this was part of the transcript, Ichihara asked him, do you have any guns? And he stated, not – only one so far today. The defendant was also not arrested. So that's significant because that meant that he had committed to provide a gun. He was able to actually get a firearm. He wasn't arrested, so there was nothing prohibiting him from actually going out and committing – you know, obtaining the firearm. Then, when Dennis Larson – So how is that tied to this particular firearm, though? Because the – there were two counts of the firearm, a Colt and then the Springfield Armory XD. During the discussions or during the controlled by involving the Colt, he – the defendant said that he could get other firearms or that he had, so far today, only one firearm, referring to the Colt. But Richard Ichihara also testified that he was instructed to try and get other firearms, and so that was how he – that was what he mentioned to Defendant Ponzalan. Then when Dennis Larson testified, he testified that he had a Springfield Armory with reloads and a very unique magazine. He testified that he obtained ownership of that Springfield Armory on November 31, 2006. Then he testified that my firearm was stolen in 2006. Then we come four months, ten days later, the Defendant Ponzalan was in his home or in the home on April 11, 2007. So based on the fact that he stated, I can get a gun, there's only one for today, in 2006, the fact that Dennis Larson had a firearm that was stolen, presumably in the remaining month and a half of 2006, and the Defendant's recent possession, four months, ten days, a jury could reasonably infer, based on the fact that the Defendant was in possession of the firearm, that he had participated in it. But isn't that a crucial question, whether or not he was in possession of the firearm? That's the point that your opposing counsel was making, that the government did not sufficiently prove that the Defendant was in knowing possession of that firearm when it was discovered. Well, and there are actually three inferences that the jury reasonably could have made that the court is to view in the light favorable to the government. One is that he was in possession four months, ten days later, so therefore he knew about the firearm. That proves knowing. The other inference was that this Defendant was in a bedroom, locked room. The room was locked. It was a ten-by-ten room, and the firearm was within arm's reach of his body. The Defendant then was told, was actually dressed by Marshal Godwin Canatta, and he was putting on his clothing, which presumably came from this locked room. The Marshals had to actually breach to get in there. Now, the Castillo case also points to that fact, that the fact that the Defendant obtained clothing for the room is another indicator that the Defendant controlled the room, that he exercised some dominion and control of that room. Were there prints on the weapon? No. There were no fingerprints obtained. When the Marshals came to the door, his brother answered? Yes. Jake Poncelon was his... All you have to do is say yes. Yes. Did the brother indicate where the Defendant was? Yes. He pointed out the bedroom. When he was asked, where is Nathaniel Poncelon, he pointed out the bedroom and referred to it, saying, this is his bedroom. Did he say, that's his bedroom? I believe the transcript states that he was referring to his bedroom. But did he say, that's his bedroom, or did he just point to the room? That's a critical point. No. The transcript states that the Marshals testified. We have Marshal Roland O'Connor. You know, this is a real simple question. Did the brother say, that's his bedroom, or not? I believe that that is the testimony. Okay. Point is taken. Point is where, because what I thought was missing is anything linking him to the house. In the transcript on the testimony of Marshal Padua on page 307, the question was, there was a warrant for Poncelon. How did you know it was his bedroom? He stated, the younger brother, Jake Poncelon, pointed out the bedroom. So the answer to the question is, no. The brother did not point to it and say, that's his bedroom. I believe the Marshals testified that it was pointed out to him. This is not difficult, but it's important. The brother did not say in any vocal words, that's my brother's bedroom. No, I don't believe that. Or that's his bedroom, or he's in his bedroom. No, you're correct. The brother pointed to a room, and the Marshals went to that room, the door was locked. Yes. There was also testimony that there were no other occupants in the home. There were only two people in the home, the defendant and his brother. Is there any testimony that the brother lived there, or that Mr. Poncelon lived there? No. Is there any record, rental, landlord, any other person connecting them to the house? No. The testimony was stricken, as hearsay. Any mail that was found there in his name? No, just the physical presence in the room, with the gun within reach, and the statements according to the Marshals, that they were pointed out to that specific room. Now, the Marshals testified that the defendant was able to reach out and take possession of the firearm, which was in a fabric bag. But did he, in fact, do that? No. In Neville's, the defendant, in fact, reached for the weapon, but we don't have that here, do we? No, we don't have anything like that situation in Neville's. But we do have the testimony from the owner of the firearm, Dennis Larson, who testified again. This is back to the unique nature of that firearm. We have a spring-filled armory with the reloads that he personally made, and a unique magazine. And that was found in the Jeep. There seems to be no doubt that the weapon, which was in a bag, inside another bag, correct? Yes, that's correct. And do we know from the record whether the exterior bag had a zipper or what? We know that the bag that contained the ammunition in the defendant's mother's Jeep matched the bag that was next to the defendant. You're making this a lot harder than it is. Did the exterior bag have a zipper clasp, or how did one get into the bag? There was a zipper on the bag, according to Ms. Matsumoto. There was a zipper on the bag, that's all you've got to say. Yes, and the fabric. Now how about the bag inside the bag? The bag inside the bag was unique because of the fabric. Did it have a zipper? Unknown. That didn't come out. So when you say he could have reached over and grabbed the weapon, he would have had to reach over, unzip the outer bag, reach inside, get the interior bag, and however it opened, clasp, zipper, drawstring, go inside it to get to the weapon, correct? That's correct. He would have had to open it. The significance of the ammunition in the Jeep is that the fabric from the ammunition matched the fabric that contained the firearm, which was next to the defendant. But the problem with that is he wasn't tied to the Jeep. It was his mother's Jeep, and there was nothing in the record indicating he had used the Jeep or regularly drove the Jeep or anything. So you have another leak. The jury could look at the fact that, well, this is the unique ammunition that came with the gun. Remember, Dennis Larson did testify that it was almost a package, and it was outside of the home, and so it was also that the actual firearm was next to Ponzalon, so they could infer reasonably that this defendant possessed the firearm and left the ammunition in the Jeep. Do we know whose house it was? No, there's no testimony. There's nothing in the record about that? No. Was the brother called? No, he was not called. The brother was not called. Did you try the case? I did. Why didn't you call the brother? I don't recall where the brother was at the time. Why didn't you put on evidence as to whose house it was? Well, the only testimony that I attempted to elicit was that a probation officer had received this tip that the defendant was at that residence in the Jigo Village, and that was stricken as hearsay. Oh, but you don't need the probation officer to say whose house it is. You can bring in a witness to say whose house it is, correct? Certainly, the government could have. I mean, in these other cases, that's what's kind of bothering me, is that in these other cases, you know, like in Ramirez, he's not the sole occupant, or in other cases, they figure out whose house it is or if the guy's renting a room, or, you know, what's the relationship of that person to the house. And we've had all kinds of combinations, as you know, guests visiting houses and guns being in dresser drawers next to where the guest is staying, or in a buffet in the dining room, that sort of thing. But there's always some link as to, you know, why is this fellow in this locked room? But proof of ownership of the home or DNA or other evidence is not required. We're not... No, nothing's required to prove your case. It's just it may not get over the bar. I mean, here you have proximity. That's really what you have, is proximity, correct? Well, we have proximity to the firearm. We also have control of that room by virtue of the defendant dressing. That's the Castillo case. But we also have the conversations that happened in 2006, Dennis Larson's testimony about the firearm, the examination that jurors were able to examine, Exhibit 18-1, the firearm as well as the ammunition and compare to make a reasonable inference. The jury could reasonably... Could you just help me out? What links... I mean, it may be the same firearm that got stolen, right? That's what Larson basically can testify. Yes. But what links it to Mr. Hunzwan? The fact that it was within his arms' reach, that it had the unique reloads and the magazine. It wouldn't have mattered if it was stolen or not stolen. All that would be true, wouldn't it? I mean, in other words, I'm trying to have a little trouble understanding what inference somebody is to make by the fact that there was a firearm stolen. They don't have any evidence that he stole it, do they? No. But it is, in the Ninth Circuit, it is reasonable for a jury to infer from the recent possession of an item that the defendant participated in the theft and therefore had knowledge of the firearm. But that's a bootstrapping argument because you have to prove possession before you can make that argument. And that's your difficulty here is proving possession. And the facts that show the possession are the control by the defendant of the room and the fact that it was locked. It is reasonable for a jury to infer that he came in, had a firearm with him, lay down, took off his clothing, fell asleep, and then the marshals came in. So your case rises or falls on two things. One, that the door to the room was locked. And two, that the weapon was in close proximity to where Mr. Poonsalon was. That's it, right? No. Additionally is the testimony that came out from the confidential informant about the availability of future guns. This was back in 2006. Because he did allude to that. He made that known that for today, in 2006, he only had this specific colt, but he would get another one for the next day. Counsel, may I ask you about the clothing? You said that he dressed in the room. Was there evidence of clothing other than the clothing he put on? No. We only know that he put on his undershorts and that a marshal assisted him. Right. So there was no evidence that he had clothes in the closet or he had additional clothing that was kept there. No. There is no additional evidence. Thank you. Okay. Thank you very much. We have a little time for rebuttal. Just a couple points on the locked door issue. If you look at Ramirez or Rodriguez, Rodriguez is the motel room case. The case doesn't say that the door was locked, but presumably the door was locked. It's a motel. The doors typically lock automatically. In any case, if you look at that case and Ramirez, which is the use in the bathroom case, it would really be, if you think about just changing the fact to where Ramirez had locked the door, the police officer had come in previously and he had locked the door to use the restroom. Ten seconds earlier, the result is different because of that. So, I mean, I think the locked door, it's easy to overemphasize the fact of the locked door. And the other point I want to make is about Richard Ichihara's testimony. I don't think the government even gave notice that that testimony was going to be used in connection with this. Rule 404B requires notice to opposing counsel when you have prior acts and evidence. But even if counsel did give them notice, I don't think it even becomes a threshold. Yeah, I mean, I don't think it overcomes the threshold. There's no identifiable scheme or plan or knowledge that would be relevant. Thank you. Thanks very much. Thanks to both counsel this morning. Thanks for coming from Guam. The case of the United States v. Punzulan is submitted.
judges: Hawkins, McKeown, Rawlinson